IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GIOVANNI REID,

                    Petitioner,

        v.

THE PHILADELPHIA D.A.'s OFFICE,
et al.,

                    Respondents.

CIVIL ACTION
NO. 18-1645

**Slomsky, J.**                                        **May 7, 2025**

**I.    INTRODUCTION** ................................................................................................ 3

**II.   BACKGROUND** .................................................................................................. 4

   A.    Procedural History ........................................................................................... 4

   B.    Section 2254 Petitions ...................................................................................... 5

**III.  STANDARDS OF REVIEW** ............................................................................... 6

   A.    Magistrate Judge's Report and Recommendation ............................................ 6

   B.    Merits Review .................................................................................................. 7

   C.    Exhaustion and Procedural Default .................................................................. 9

**IV.   ANALYSIS** ........................................................................................................ 10

   A.  Petitioner's Miller/Montgomery Claim ........................................................... 10

       1. Applicable Law ........................................................................................... 10

2. Petitioner's is Not Entitled to an Individualized Sentencing
Hearing Under <u>Miller v. Alabama</u> or <u>Montgomery v. Louisiana</u> ................................ 12

3. Petitioner's Maximum Sentence of Life Imprisonment, Which
Upon His Release Resulted in a Sentence of Life on Parole,
Does Not Violate <u>Miller v. Alabama</u> or <u>Montgomery v. Louisiana</u> ............................ 14

4. A Sentence For Second-Degree Murder Can Be Imposed on a Juvenile.................... 16

B. Petitioner's Actual Innocence Claim ...................................................................... 17

1. Petitioner's Claim is Non-Cognizable on Federal Habeas Review ............................ 17

2. Petitioner's Claim is Also Meritless ........................................................... 18

i. Wayne Richman's Statements ................................................................. 19

ii. Tyrone Mackey's Statements ................................................................. 20

iii. Crime Scene Photographs...................................................................... 21

C. Petitioner's Adopted Admission Claim .............................................................. 21

1. Petitioner's Claim is Non-Cognizable on Federal Habeas Review ............................ 22

2. Second-Degree Murder.............................................................................. 23

3. Respondents Did Not Adopt an Exonerating Statement ............................................. 25

V. **CONCLUSION** ................................................................................ 26

## I.    INTRODUCTION

In 1991, Petitioner Giovanni Reid ("Petitioner") was convicted of second-degree murder and related offenses after he and two co-conspirators robbed Robert Janke, who was shot and killed by one of the co-conspirators.  Petitioner was 16 years old at the time of the murder and was sentenced to a mandatory sentence of life without parole.

After the United States Supreme Court decision in Miller v. Alabama, 567 U.S. 460 (2012), which held that mandatory sentences of life imprisonment without parole for persons under 18 years of age violated the Eighth Amendment to the United States Constitution, the Superior Court of Pennsylvania vacated Petitioner's sentence of life imprisonment and he was resentenced to an agreed upon term of 25 years imprisonment to life imprisonment.  Petitioner was immediately eligible for parole, was released from custody and was placed on parole for the remainder of his life.

Before the Court is a pro se petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, filed by Petitioner against the Philadelphia District Attorney's Office and the Attorney General of the State of Pennsylvania (collectively, "Respondents").  He argues that his new maximum life imprisonment sentence and his placement on parole for life violate Miller v. Alabama.  He further maintains that there is newly discovered evidence that proves he is actually innocent of second-degree murder.  Lastly, he contends that Respondents adopted statements during his Post Conviction Relief Act ("PCRA") hearing in state court that prove he is not guilty of second-degree murder.

The Court referred the Petition to United States Magistrate Judge Lynne A. Sitarski for a Report and Recommendation.  (Doc. No. 22.)  On October 9, 2024, Judge Sitarski issued a Report and Recommendation, recommending that the Petition be denied.  (Doc. No. 36.)  Defendant filed objections to the Report and Recommendation which are now before the Court for consideration.

(Doc. No. 39.)  For reasons discussed below, however, the Court will adopt Judge Sitarski's Report

and Recommendation (Doc. No. 36) and deny the Petition for Writ of Habeas Corpus.  (Doc. Nos.

2, 20).

## II.    BACKGROUND

### A.    Procedural History

Respondents and Judge Sitarski have accurately summarized Petitioner's state court case

as follows:

> In 1991, when he was 16 years old, Reid and two others [Dwayne and Carlton
> Bennett] robbed Robert Janke in Philadelphia. During the course of the robbery,
> one of Reid's coconspirators [Dwayne Bennett] shot and killed Janke. Following a
> jury trial, Reid was convicted of second-degree murder and related offenses and
> sentenced to the mandatory sentence of life without the possibility of parole for
> second-degree murder, plus concurrent terms of years for the related offenses.
> Reid's convictions and sentences were affirmed on direct appeal, see
> Commonwealth v. Reed, 1 643 A.2d 707 (Pa. Super. Ct. 1994) (table), and his
> initial efforts to obtain post-conviction relief were unsuccessful, see 742 A.2d 1150
> (Pa. Super. Ct. 1999) (table). Reid also unsuccessfully sought federal habeas relief
> in this Court. See Reid v. Vaughn, 279 F. Supp. 2d 636 (E.D. Pa. 2003), aff'd, 109
> F. App'x 500 (3d Cir. 2004).
>
> The Supreme Court subsequently held that mandatory life-without- parole [LWOP]
> sentences violate the Eighth Amendment for people under the age of 18 at the time
> of their offenses. See Miller v. Alabama, 567 U.S. 460 (2012) and Montgomery v.
> Louisiana, 577 U.S. 190 (2016). Reid again sought postconviction relief, [Footnote
> 2:  Reid's second PCRA petition was filed in 2005 and amended in 2009, both
> before Miller. However, Miller was decided during the pendency of Reid's appeals
> to the Superior Court, and the Superior Court remanded for resentencing. See
> Commonwealth v. Reid, No. 1980 EDA 2014, 2016 WL 1292915 (Pa. Super. Ct.
> Apr. 1, 2016)] arguing that his sentence was unconstitutional, among other things.
> The state court denied relief as to Reid's convictions but vacated his life sentence
> and ultimately resentenced him to an agreed-upon term of 25 years to life for the
> second-degree murder conviction, with no further penalty for his related
> convictions. This disposition made Reid immediately eligible for parole
> consideration. [Footnote 3: Reid has since been paroled, and he will remain on
> parole for the rest of his life. See PA. CODE § 63.2.]
>
> In 2017, Reid appealed from his new judgment of sentence, arguing that his
> maximum sentence of life imprisonment is unconstitutional under Miller and
> Montgomery and that statements made by the Commonwealth on second PCRA
> review amounted to "admissions and the adoption of a nonliability statement,"

which also rendered his maximum sentence unconstitutional. The state court rejected these claims, concluding that Reid's maximum life sentence was not unconstitutional and that the claim related to the Commonwealth's statements essentially amounted to a challenge to his underlying conviction, which was outside the scope of the relief Reid could obtain on appeal after the <u>Miller</u> resentencing. <u>See</u> <u>Commonwealth v. Reid</u>, No. 1702 EDA 2017, 2019 WL 2246082 (Pa. Super. Ct. May 24, 2019).

(Doc. No. 36 at 1-2) (quoting Doc. No. 29 at 1-3).

### B.    Section 2254 Petitions

On April 18, 2018, Petitioner filed in this case his second Habeas Corpus Petition.[1] (Doc. No. 2.) On the same day, April 18, 2018, Petitioner filed a Motion to Stay the Petition pending the outcome of his appeal in state court. (Doc. No. 6.) The case was placed in suspense pending the outcome of that appeal. (Doc. No. 17.) As noted above, on May 24, 2019, the Superior Court of Pennsylvania affirmed his judgment of sentence of 25 years imprisonment to lifetime imprisonment. <u>See</u> <u>Commonwealth v. Reid</u>, No. 1702 EDA 2017, 2019 WL 2246082 (Pa. Super. Ct. May 24, 2019). This sentence made him immediately eligible for parole consideration. Petitioner was released from custody on September 4, 2017 and is currently serving life on parole. His federal case was then removed from suspense. (Doc. No. 19.)

On September 30, 2021, Petitioner filed a supplemental Habeas Corpus Petition. (Doc. No. 20.) In his Petitions, he essentially alleges four (4) claims for relief:

1.     His new sentence violates <u>Miller v. Alabama</u> because he was not provided with an individualized re-sentencing hearing that considered all relevant sentencing factors;

2.     His new maximum sentence of life imprisonment, which upon his release resulted in him being placed on lifetime parole, violates <u>Miller v. Alabama</u>;

---

[1]     As noted, Petitioner previously filed a habeas corpus petition in 2003. As discussed further below, Petitioner raised in that Petition a claim that the Commonwealth violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) by failing to disclose a conversation between Tyrone Mackey, a cooperating witness, and the prosecutor, Mr. McGovern, during trial. The Petition was denied by Judge Dalzell on August 27, 2003, and affirmed by the Third Circuit. <u>See</u> <u>Reid v. Vaughn</u>, 279 F. Supp. 2d 636 (E.D. Pa. 2003), <u>aff'd,</u> 109 F. App'x 500 (3d Cir. 2004).

3.    Petitioner is actually innocent of second-degree murder;

4.    The Commonwealth adopted statements during his PCRA proceedings indicating that the murder was conducted after the underlying felony was completed.

(See generally Doc. Nos. 2, 20.)

On May 23, 2023, the Court referred the Petitions to United States Magistrate Judge Lynne A. Sitarski for a Report and Recommendation. (Doc. No. 22.) On October 10, 2024, Judge Sitarski issued a Report and Recommendation ("R&R") recommending that Petitioner's habeas petition be denied. (Doc. No. 36.) On November 19, 2024, Petitioner filed Objections to Judge Sitarski's R&R. (Doc. No. 39.) Petitioner's Writ for Habeas Corpus (Doc. Nos. 2, 20) is now ripe for disposition.

## III.    STANDARDS OF REVIEW

### A.    Magistrate Judge's Report and Recommendation

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge is permitted to designate a magistrate judge to make proposed findings and recommendations on petitions for post-conviction relief. See § 636(b)(1)(B); E.D. PA. CIV. R. 72.1. Any party may file objections in response to the magistrate judge's report and recommendation. § 636(b)(1)(C). Whether or not an objection is made, a district judge "may accept, reject, or modify, in whole or in part, the findings of recommendations made by the magistrate judge with further instructions." (Id.) "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court." Henderson v. Carlson, 812 F.2d 784, 878 (3d Cir. 1987).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a petitioner's objections to a magistrate judge's report and recommendation. E.D. PA. CIV. R. 72.1. Under that rule, a petitioner must "specifically identify the portions of the proposed findings,

6

recommendations or report to which objection is made and the basis for such objections." Savior v. Superintendent of Huntingdon SCI, No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012). Upon review, "[a district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." § 636(b)(1)(C). De novo review is non-deferential and generally permits the district court to conduct an "independent review" of the entire matter. Salve Regina Coll. v. Russell, 499 U.S. 255, 238 (1991). "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper." Owens v. Beard, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)).

**B.    Merits Review**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review will only be granted if: (1) the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(1)–(2). Determinations of factual issues made by a state court "are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)); see also Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003). The United States Supreme Court has defined clearly established law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyear v. Andrade, 538 U.S. 63, 71-72 (2003).

A state court ruling is "contrary to" clearly established federal law for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court decisions, but "unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. The state court's ruling must be "objectively unreasonable, not merely wrong." Virginia v. LeBlanc, 137 S.Ct. 1726, 1728 (2017) (internal citation omitted). As the Third Circuit has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless the court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411). Deference is given to state court rulings, and the application of the "contrary to" and "unreasonable application clauses" has proven to be "difficult to meet." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

This burden is substantial. And under the AEDPA, review of state court legal and factual determinations is highly deferential. See Palmer v. Hendricks, 592 U.S. 386, 391–92 (3d Cir. 2010) ("[The] AEDPA requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations.") If a state court did not adjudicate a claim on the merits, however, the deferential standard of the AEDPA does not apply.

See id. at 392.  Rather, in such cases, "the federal habeas corpus court must conduct a de novo review over pure legal questions and mixed questions of law and fact . . . ."  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

### C.    Exhaustion and Procedural Default

For a petitioner's habeas claim to be considered by a federal court, the petitioner must meet the exhaustion requirement prescribed by Section 2254(b).  This provision requires a petitioner to "give the state courts one full opportunity" to cure the petitioner's alleged constitutional violations.  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  Exhaustion requires the petitioner to present to the state courts the same legal theory applied to the same facts.  Landano v. Rafferty, 897 F.2d 661, 669 (3d Cir. 1990).  A petitioner bears the burden of demonstrating that he has exhausted each claim in each level of the state judicial system.  Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993).  It also requires the petitioner to preserve each claim at the state appellate level.  See Holloway v. Horn, 355 F.3d 707, 714. (3d Cir. 2004) (exhaustion satisfied only if claim fairly presented at each level of the state court system) (citing O'Sullivan, 526 U.S. at 844–45).

Moreover, "a habeas claim is . . .considered procedurally defaulted when a state court relies on or would rely on 'a state law ground that is independent of the federal question and adequate to support the judgment.'"  Id. at 6 (citing Beard v. Kindler, 668 U.S. 53, 53 (2009)).  The Third Circuit has held that the Pennsylvania Post Conviction Relief Act's ("PCRA") one-year statute of limitations is one such "independent and adequate" state law ground upon which habeas relief may be denied.  See Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002).

There are, however, exceptions that a petitioner may assert to overcome a procedurally defaulted claim, such as demonstrating:  (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a

fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). Under the first prong of the exception, "cause" is demonstrated by "some objective factor external to the defense [that] impeded counsel's efforts to comply with the state's procedural rule." Id. Under the second prong, a 'fundamental miscarriage of justice' is demonstrated by a showing of actual innocence, which means factual innocence, not mere legal insufficiency. Schlup v. Delo, 513 U.S. 298, 324-26 (1995)). And a petitioner may support a showing of "actual innocence" through his "allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324.

## IV.    ANALYSIS

### A.  Petitioner's __Miller__/__Montgomery__ Claim

First, Petitioner argues that his new sentence of 25 years to life imprisonment for second-degree murder is unconstitutional under Miller v. Alabama, 567 U.S. 460 (2012) and Montgomery v. Louisiana, 577 U.S. 190 (2016).[2]

#### 1.  Applicable Law

In Jones v. Mississippi, the United States Supreme Court summarized recent case law, including Miller and Montgomery, regarding the Eighth Amendment's Cruel and Unusual Punishment standard as it relates to juveniles convicted of murder:

> In a series of Eighth Amendment cases applying the Cruel and Unusual Punishments Clause, this Court has stated that youth matters in sentencing. In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Court concluded that the Eighth Amendment prohibits capital punishment for murderers who were under 18 at the time of their crimes. And in Graham v. Florida,

---

[2] This claim is timely under the AEDPA. As noted by Respondents, Petitioner was re-sentenced on April 20, 2017. While his appeal was pending, he filed this Petition on April 18, 2018. The case was stayed pending the resolution of Petitioner's appeals in state court, and then restored to active status once the Superior Court of Pennsylvania affirmed Petitioner's new judgment of sentence. Because this claim challenges his new sentence, it is timely.

560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the Court held that the Eighth Amendment prohibits life without parole for offenders who were under 18 and committed <u>nonhomicide</u> offenses. Importantly, however, <u>Graham</u> did not prohibit life without parole for offenders who were under 18 and committed <u>homicide</u>. The <u>Graham</u> Court stated: "There is a line between homicide and other serious violent offenses against the individual." <u>Id.</u>, at 69, 130 S.Ct. 2011 (internal quotation marks omitted).

And then in <u>Miller</u> in 2012, the Court allowed life-without-parole sentences for defendants who committed <u>homicide</u> when they were under 18, but only so long as the sentence is not mandatory—that is, only so long as the sentencer has discretion to "consider the mitigating qualities of youth" and impose a lesser punishment. 567 U.S. at 476, 132 S.Ct. 2455 (internal quotation marks omitted). Four years later, <u>Montgomery</u> held that <u>Miller</u> applied retroactively to cases on collateral review. 577 U.S. at 206, 212, 136 S.Ct. 718.

593 U.S. 98, 105-106 (2021).

Here, the critical cases at issue are <u>Miller</u> and <u>Montgomery</u>.  In <u>Miller</u>, the Supreme Court held that mandatory-sentencing schemes for juveniles convicted of homicide imposing life without parole ("LWOP") violates the Eight Amendment.  <u>Miller</u>, 567 U.S. at 489.  The important words to focus on in this holding are "mandatory" and "life without parole" sentences.  Under <u>Miller</u>, juveniles can still be sentenced to LWOP, but only if the sentence is not mandatory and the following factors are considered by the sentencing judge:  "immaturity, impetuosity, and failure to appreciate risks and consequences," the defendant's family and home environment, the circumstances of the homicide, and the possibility of rehabilitation.  <u>Id.</u> at 477-78.

In <u>Montgomery</u>, the Supreme Court held that <u>Miller</u>'s holding is retroactive.  577 U.S. at 206.  Thereafter, in <u>Jones</u>, the Supreme Court clarified <u>Miller</u>'s scope, noting that <u>Miller</u> only "required that a sentencer consider youth as a mitigating factor when deciding whether to impose a <u>life-without-parole</u> sentence."  <u>Id.</u> at 109 (emphasis added).

Post-<u>Miller</u>, the Pennsylvania General Assembly enacted 18 Pa. Cons. Stat. § 1102(b), which mandates that juveniles convicted of second-degree murder prior to June 25, 2012 be re-sentenced to a term of life imprisonment. The statute reads in relevant part:

> [A] person who has been convicted of murder of the second degree, of second degree murder of an unborn child or of second degree murder of a law enforcement officer shall be sentenced to a term of life imprisonment.

18 Pa. Cons. Stat. § 1102(b). This statute permits a juvenile to be sentenced to a minimum term of years' imprisonment followed by a maximum term of life imprisonment. Once a defendant is released on parole sometime after serving the minimum sentence, the defendant remains on parole "until the expiration of his maximum sentence, or until he is legally discharged." 37 Pa. Code § 63.2. Thus, Section 1102(b) does not violate <u>Miller</u>.

### 2. Petitioner's is Not Entitled to an Individualized Sentencing Hearing Under <u>Miller v. Alabama</u> or <u>Montgomery v. Louisiana</u>

As noted, Petitioner argues that his new sentence of 25 years' imprisonment to life imprisonment violates <u>Miller</u> and <u>Montgomery</u> because he was not afforded an individualized resentencing hearing.

Here, Petitioner was initially sentenced to mandatory life without parole. After the Supreme Court's decision in <u>Miller</u>, Petitioner was re-sentenced to a term of 25 years to life imprisonment. Importantly, Petitioner and the District Attorney's Office agreed upon this new sentence. (Doc. No. 30 at 1151-52.) In the agreement, Petitioner waived his right to a sentencing hearing. (<u>Id.</u>) Before his former, unlawful sentence was vacated, the court conducted a colloquy of Petitioner during which he told the court that "he understood his right to a resentencing hearing and wanted to accept the recommended sentence and proceed with a negotiated resentencing." (<u>Id.</u> at 1188 (quoting N.T. 4/20/2017 at 10-11).) The court found that Petitioner's decision to accept

the new sentence negotiated with the District Attorney's office was made voluntarily, knowingly and of his own free will.  (Id. (quoting N.T. 4/20/2017 at 15).)

While Petitioner now contends that he is entitled to an individualized re-sentencing hearing based on the Miller factors, they are inapplicable to him because he was not re-sentenced to life without the possibility of parole.  Petitioner is not currently incarcerated and was immediately released on parole after his resentencing.  He is still on parole today.  Moreover, in considering the outcome of Petitioner's PCRA proceedings, the Superior Court of Pennsylvania found that Petitioner's new sentence was now consistent with state precedent, e.g., Commonwealth v. Ligon, 206 A.3d 1196 (Pa. Super. 2019), discussed infra, and found that because he was sentenced to a minimum term of years to a maximum term of life imprisonment, Miller was not violated.[3]  Reid, 2019 WL 2246082, at *2.  And, as noted above, Petitioner's sentence is not contrary to federal law since Miller only applies to mandatory life without parole sentences.

In addition, it should be noted that recent federal and state cases hold that a juvenile defendant is not entitled to an individualized sentencing hearing when he is re-sentenced to a maximum life sentence and has the opportunity for parole.  In other words, a juvenile defendant is

---

[3]  Petitioner also avers that Respondents should be judicially estopped from taking a contrary position than they did in Commonwealth v. Ligon, 206 A.3d 1196 (Pa. Super. Ct. 2019).  He contends that in Ligon, the District Attorney argued that a mandatory maximum sentence of life imprisonment for juveniles is unconstitutional.  (Doc. No. 20 at 4.)  But, as Judge Sitarski noted in her R&R, "it is not clear that Respondents convinced any court in the Ligon matter to accept their argument that a mandatory maximum sentence of life imprisonment is unconstitutional." (Doc. No. 36 at 10.)  Rather, the District Attorney's arguments were rejected in Ligon, where the Superior Court held that Miller "did not hold that life sentences without parole eligibility are unconstitutional . . . ." Ligon, 206 A.3d at 1200.  The court only held that life sentences for juveniles are unconstitutional if they are mandatory.  And "judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position." G–I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009).  Following this precedent and others noted, the District Attorney would not be able today to make the same argument as they did in Ligon.

only entitled to a sentencing hearing where the sentencing judge must consider the <u>Miller</u> factors if the juvenile can be sentenced to life without parole.  <u>See</u> <u>Gonzalez v. DA of Berks County</u>, No. 20-789, 2020 WL 8835431, at **7-8 (E.D. Pa Aug. 31, 2020) (holding that the <u>Miller</u> factors were inapplicable to a juvenile that was re-sentenced to a term of 35 years to life for first-degree murder); <u>Twiggs v. Pa. Bd. Of Prob. & Parole</u>, No. 20-3683, 2021 WL 1987537, at *4 (E.D. Pa. Apr. 22, 2021) (interpreting <u>Miller</u>'s scope to only apply to sentences of life without parole); <u>see also</u> <u>Commonwealth v. Felder</u>, 269 A.3d 1232, 1245-46 (Pa. 2022) (finding that <u>Miller</u> is not violated by a discretionary sentencing scheme that imposes a minimum term of years and maximum of life); <u>Commonwealth v. Lekka</u>, 210 A.3d 343, 355-56 (Pa. Super. Ct. 2019) (holding that "[i]n cases where the Commonwealth does not seek a [LWOP] sentence, the application of the <u>Miller</u> factors is not required"); <u>Ligon</u>, 206 A.3d at 1200 (finding that "a sentence with a term of years minimum and a maximum sentence of life does not violate <u>Miller</u>'s individualized sentencing requirement . . .").

### 3. Petitioner's Maximum Sentence of Life Imprisonment, Which Upon His Release Resulted in a Sentence of Life on Parole, Does Not Violate <u>Miller v. Alabama</u> or <u>Montgomery v. Louisiana</u>

Petitioner also apparently claims that because he was sentenced to a maximum term of life imprisonment for second-degree murder, which upon his release resulted in a mandatory term of life on parole, the resulting life on parole is unconstitutional under <u>Miller</u>.

The Superior Court in <u>Ligon</u> rejected the argument that a maximum term of life imprisonment leading to a lifetime parole tail is unconstitutional under <u>Miller</u>:

> The <u>Miller</u> Court did not call into question the ability of state parole boards to make the decision as to whether a juvenile murderer should be paroled and did not equate a sentence of LWOP with one for life with the possibility of parole. <u>Montgomery</u>, <u>supra</u> at 736. In fact, it did the opposite, merely requiring the states to make the relevant inmates parole eligible, thereby insuring that those prisoners who have shown the ability to reform will receive a meaningful opportunity for release. It did not hold that life sentences with parole eligibility are

> unconstitutional, or that juvenile murderers must be released at some point regardless of their fitness to rejoin society. Thus, a sentence with a term of years minimum and a maximum sentence of life does not violate <u>Miller</u>'s individualized sentencing requirement, because it properly leaves the ultimate decision of when a defendant will be released to the parole board.

<u>Ligon</u>, 206 A.3d 1196, 1206; <u>see also</u> <u>Commonwealth v. Johnson</u>, No. 3357 EDA 2018, 2019 WL 7841996, at *3 (Pa. Super. Ct. Sept. 24, 2019) (finding that defendant's argument that his mandatory lifetime parole tail stemming from his mandatory maximum life sentence is "based upon an overbroad interpretation" of <u>Miller</u> and <u>Montgomery</u>); <u>Riley v. Wetzel</u>, No. 21-CV-5360, 2023 WL 3604370, at *3 (E.D. Pa. Mar. 8, 2023), <u>report and recommendation adopted,</u> No. 21-CV-5360, 2023 WL 3611528 (E.D. Pa. May 23, 2023) (holding "Petitioner's lifetime-parole sentence is not contrary to or an unreasonable application of <u>Miller</u>").

Thus, <u>Miller</u> and <u>Montgomery</u>'s holdings are inapplicable to Petitioner's sentence of lifetime parole. Their holdings were narrow: "We therefore hold that <u>mandatory life without parole</u> for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" <u>Miller</u>, 567 U.S. at 465 (emphasis added). Petitioner was not sentenced to life without parole at his re-sentencing. Rather, he was re-sentenced to an agreed upon term of 25 years to life imprisonment, in accordance with Section 1102(b), which requires a maximum term of life imprisonment, and 37 PA. CODE § 63.2, which requires Petitioner remain on parole for the rest of his life.[4] These statutes are constitutional under Pennsylvania law. <u>See</u> <u>Commonwealth v. Olds</u>, 192 A.3d 1188, 1198 (Pa. Super. 2018) (affirming

---

[4] 37 PA. CODE § 63.2 provides as follows:

> The parolee shall remain in the legal custody of the Board until the expiration of his maximum sentence, or until he is legally discharged.

the constitutionality of a mandatory maximum term of life imprisonment for second-degree murder under Section 1102(b)).

### 4. A Sentence For Second-Degree Murder Can Be Imposed on a Juvenile

Next, in his Objections to the R&R, Petitioner argues that "brain science" evidence relied upon in <u>Roper</u>, <u>Miller</u> and <u>Graham</u> "calls into question whether it is legally possible to even apply a reasonable man standard under felony murder to a kid." (Doc. No. 39 at 4-5.) In other words, Petitioner attempts to argue that because juveniles may have an inability to foresee events in the same manner as adults, they cannot be charged with or re-sentenced to second-degree murder, also known as felony murder.

In <u>Miller</u>, the Supreme Court noted that "<u>Roper</u> and <u>Graham</u> emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." <u>Miller</u>, 567 U.S. at 471. Specifically, in <u>Graham</u>, the Supreme Court distinguished between juvenile and adult minds:

> [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. 16–24; Brief for American Psychological Association et al. 22–27. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. <u>Roper</u>, 543 U.S., at 570, 125 S.Ct. 1183. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."

<u>Graham</u>, 560 U.S. at 68.

These findings in <u>Roper</u>, <u>Graham</u>, <u>Miller</u> and <u>Jones</u>, however, did not relinquish the ability for juveniles to be charged with severe crimes like second-degree murder. Rather, they limit the penalties for these crimes so that children would not be sentenced to LWOP without reviewing attendant circumstances surrounding the crimes. "A State is not required to guarantee eventual

freedom to a juvenile offender . . .What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." <u>Id.</u> at 75.

Nothing in <u>Miller</u>'s holding suggests that juveniles cannot be charged with second-degree murder, only that if they are convicted of such a crime and sentenced to life without parole, a sentencing judge must take into consideration the mitigating factors.  <u>See</u> <u>Olds</u>, 192 A.3d at 1198 (finding that "the Eighth Amendment permits imposition of section 1102(b)'s mandatory maximum term of life imprisonment for juveniles convicted of second-degree murder, who did not kill or intend to kill").

Thus, because Petitioner was not re-sentenced to LWOP and was given a term of years sentence which afforded him immediate eligibility for parole, his sentence was not unconstitutional nor in violation of <u>Miller</u>.  Therefore, this claim will be denied.

### B.  Petitioner's Actual Innocence Claim

Petitioner also asserts that there is "newly discovered" evidence that proves his innocence. (Doc. No. 2 at 17.)  For the reasons stated below, this claim is not only non-cognizable on habeas review but also meritless.

### 1.  Petitioner's Claim is Non-Cognizable on Federal Habeas Review

First, as noted in Judge Sitarski's R&R, a claim of actual innocence is not cognizable on habeas review without an independent constitutional challenge.  (Doc. No. 36 at 21-22); <u>see</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993) (holding that "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact").  The Third Circuit follows this standard, finding that in a habeas petition "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

Kontakis v. Beyer, 19 F.3d 110, 114 (3d Cir. 1994) (citing Estelle v. McGuire, 506 U.S. 62, 68 (1991)).

Here, Petitioner was re-sentenced in 2017 due to his unconstitutional mandatory life without parole sentence. Therefore, his claims for habeas relief must relate to his circumstances of his re-sentencing, not an attempt to re-argue the evidence presented at trial and post-trial hearings. Petitioner violates the latter precept by arguing his actual innocence alone is an underlying basis for habeas relief. (Doc. No. 36 at 21 n. 8.) This stand-alone claim of actual innocence is not cognizable on federal habeas review. See Rainey v. Superintendent Coal Twp. Sci, No. CV 16-3184, 2016 WL 9410906, at *1 (3d Cir. Oct. 27, 2016) (holding that an actual innocence claim "is not cognizable as a freestanding claim that would entitle [a defendant] to habeas relief"); Brown v. Kerestes, No. 13-CV-3068, 2020 WL 9762875, at *6 (E.D. Pa. Nov. 30, 2020), report and recommendation adopted, No. CV 13-3068, 2021 WL 2137568 (E.D. Pa. May 26, 2021) (finding that where claim was "related to evidence introduced against him at trial, rather than his resentencing, . . . the Superior Court properly dismissed his appeal as outside the scope of review").

### 2. Petitioner's Claim Is Also Meritless

Even if the Court recognized Petitioner's actual innocence claim, it is nevertheless without merit.

The United States Supreme Court established that "actual innocence, if proved, serves as a gateway through which a petitioner may pass." McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). But it also held that "tenable actual-innocence gateway pleadings are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable

doubt.'" Id. (citing Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Such a claim must be supported

with "reliable evidence."  Schlup, 513 U.S. at 324.

### i.  Wayne Richman's Statements

As an initial matter, Petitioner contends that on February 6, 2006, he became aware of a

statement from the victim's roommate, Wayne Richman, that Richman witnessed Janke's murder,

and that while the murder occurred Petitioner was down the street "yelling out **no** and **don't**."

(Doc. No. 2 at 17 (emphasis in original).)  He further maintains that Richman was pressured not

to testify by two Philadelphia police detectives, but he eventually did testify at two evidentiary

hearings held post-trial when ordered to do so by court order.[5]  (Id. at 18.)

Here, Petitioner has not met the gateway standard.  First, regarding the statements by

Richman, the state court noted Richman's wavering and poor credibility.  Commonwealth v. Reid,

No. 1980 EDA 2014, 2016 WL 1292915, at *5 (Pa. Super. Ct. Apr. 1, 2016).  Specifically, in his

initial statement to the police just after the shooting, Richman did not tell the police that he

witnessed the shooting.  Id. at *3; (Doc. No. 2 at 34.)  Rather, when asked whether he was with the

victim on the night of the murder, he stated:  "No, I found out we were at a party together early

this morning . . .I didn't see him there.  I left the party around 4AM and came home."  Id.

Then, on February 6, 2006, approximately 15 years after the robbery and murder, Petitioner

received an email from Richman stating:

---

[5]    As noted earlier, Petitioner was originally tried and sentenced in 1991.  He claims that on February
6, 2006, he learned of the above statements by Wayne Richman.  The state court ordered an
evidentiary hearing on this issue on March 14, 2007, but, according to Petitioner, Richman was
threatened by two Philadelphia detectives not to testify on behalf of Petitioner and for this reason
Richman never appeared to testify.  Richman was then court-ordered to appear to testify and did
so on November 30, 2010.  Then, the state judge handling his case retired, and the case was
transferred to another judge.  A second evidentiary hearing was held on September 12 and 13,
2012.  Richman ultimately testified at one deposition in 2006 and two evidentiary hearings in
2010 and 2012.

[I] don't want to say much right now, but [I] do have a little bit of information about your case.

[By the way] [I] was [R]obert[']s roommate at the time of his murder and was on [N]audain [Street] looking towards south after you guys walked by.  [T]he police never came to question me. . . .

(Doc. No. 2 at 36.)

Next, in a deposition taken on March 13, 2006, Richman testified that he saw Janke at the party the night of the murder.  (Id. at 38; Doc. No. 30-1 at 5.)  He also admitted that he was intoxicated on drugs and alcohol and witnessed the murder from approximately three hundred feet away.  Reid, 2016 WL 1292915, at *1.

Richman's statements about the events that occurred during and after the murder are inconsistent.  He did not tell police that he witnessed anything on the night of the murder, and approximately fifteen (15) years later he claims he did so while intoxicated on drugs and alcohol. Petitioner cannot show that Richman's statements would have led a reasonable jury to find him not guilty had Richman testified at trial.

### ii.  Tyrone Mackey's Statements

Likewise, the claim related to Tyrone Mackey is also meritless and prior habeas relief on this issue was denied.  See Reid v. Vaughn, 279 F. Supp. 2d 636 (E.D. Pa. 2003), aff'd, 109 F. App'x 500 (3d Cir. 2004).  Mackey was present at the time of the murder.  At trial, Mackey testified that Petitioner was standing at the victim's side when Dwayne Bennett shot him.  Id. at 639.  Then, during Petitioner's evidentiary hearing on his initial habeas petition, Mackey stated that he lied when he placed Petitioner next to the victim.  Rather, Petitioner was standing 15 to 20 feet away from where Dwayne Bennett shot Janke.  Id. at 641.  The late Honorable Judge Stewart Dalzell found Mackey's testimony throughout Petitioner's criminal proceedings "equivocal" and

unreliable.  See id. at 639, 643 (finding "major defects" in Mackey's testimony and that Mackey

perjured himself at both Petitioner's trial and preliminary hearing).

### iii.  Crime Scene Photographs

Lastly, Petitioner avers that crime scene evidence, specifically Commonwealth's Exhibits

C-3 and C-4 at trial, photographs of the steel garage door where Janke was shot and found lying

on the ground, were contrary to witness testimony presented at trial.  (Id. at 21.)  He submits that

the testimony of Lorraine Hill, an eyewitness to the murder, stated that three black men were

holding down Janke while Bennett shot and killed him.  But Petitioner maintains that the blood

spatter on the garage door was "in an uninterrupted pattern."  (Id.)  He contends that, had he been

holding down Janke as alleged by Hill, the blood splatter on the garage door "should not have been

there" because he would have been standing in between Janke and the door.  (Id. at 22.)

However, this evidence was all presented at trial.  It was the role of the jury to assess the

evidence and make factual determinations, which is not the role of this Court in a habeas corpus

petition.  The jury heard Lorraine Hill's testimony and viewed the crime scene photographs.

Petitioner avers that this evidence, coupled with the statements of Richman and Mackey, show that

he was not holding the victim down at the time of his death.  But, again, the statements by Richman

and Mackey are unreliable, and Petitioner has not proven that had these statements been offered at

trial, he would not have been found guilty of second-degree murder.

For these reasons, Petitioner's actual innocence claim will be denied.

### C.  Petitioner's Adopted Admission Claim

Petitioner's final claim is that Respondents "adopted an exonerating statement" at an

evidentiary hearing during his PCRA proceedings.  (Doc. No. 2 at 25.)  Specifically, Petitioner

asserts that on September 4, 2012, before his second evidentiary hearing, Dwayne Bennett met

with the Commonwealth and told Detective Edward Rocks and Assistant District Attorney ("ADA") B.J. Graham-Rubin the following:

> All three men [D. Bennett, C. Bennett and Petitioner] had guns. [I] put the gun to [Janke's] head while the other two were going through his pockets. We all knew about the robbery. What we all didn't know was that I was going to shoot and kill Robert Janke when [the robbery] was over.

(Doc. No. 2 at 24.)

Petitioner claims that at the evidentiary hearing held on November 7, 2012, ADA Laurie Williamson "adopted" Dwayne Bennett's statement by telling the court: "What was truthful, Your Honor, is what Dwayne Bennett told Miss Graham-Rubin and Detective Rocks when he came to our office shortly before the hearing and was interviewed briefly. . ." (Id. at 25 (quoting Doc. No. 2 at 48).) Petitioner contends that by ADA Williamson "adopting" Bennett's statement, it proves that Petitioner did not know that Dwayne Bennett was going to kill Janke and "it establishes that Mr. Janke's death did not occur in the course of, or in furtherance of the [robbery.]" (Id. at 25; see also Doc. No. 20 at 7).

### 1. Petitioner's Claim is Non-Cognizable on Federal Habeas Review

Respondents contend that Petitioner did not raise this claim during his second PCRA petition and thus it is procedurally defaulted. (Doc. No. 29 at 9 (quoting Reid, 2016 WL 1292915, at *2).) Rather, the first time he raised this claim was on appeal from his resentencing, which the Superior Court rejected on procedural grounds. (Id. at 7.) Petitioner, however, alleges that it was raised in his appellate brief, but the Superior Court did not address the claim. (Doc. No. 35 at 5-6.) Judge Sitarski, giving Petitioner the benefit of the doubt as a pro se litigant, reviewed the claim and found it meritless. (Doc. No. 36 at 12-19.)

This claim, like his newly discovered evidence claim, is not related to his re-sentencing. See Commonwealth v. Anderson, 801 A.2d 1264, 1266 (Pa. Super. Ct. 2002) (finding a defendant

may only raise "issues reviewable in a direct appeal [that] would be challenges to the sentence imposed . . . ."). These claims attempt to re-litigate the underlying second-degree murder conviction. Thus, this claim is procedurally defaulted and non-cognizable unless Petitioner shows (1) cause for the default or (2) that failure to consider these claims will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991). He cannot show both. But because Petitioner asserts he previously raised this claim, and given Petitioner's pro se status, the Court will review the merits of the claim.

### 2. Second-Degree Murder

First, under Pennsylvania law, second-degree murder, also known as felony murder, occurs when a murder "is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 PA. STAT. & CONS. STAT. ANN. § 2502(b); see also Commonwealth v. Mitchell, 135 A.3d 1097, 1101 (Pa. Super. Ct. 2016). "Perpetration of a felony" is defined under the statue as:

> The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 PA. STAT. & CONS. STAT. ANN. § 2502(d).

It is "immaterial" whether a defendant anticipates the victim's death, and it is the role of the jury to determine whether the death was in furtherance of the conspiracy. Commonwealth v. Johnson, 485 A.2d 397, 401 (Pa. Super. Ct. 1984). However, a defendant may have a defense "if the accomplice voluntarily abandons the scheme appreciably before the homicide occurs, giving his fellow conspirators sufficient time to follow his example." Commonwealth v. Sampson, 285 A.2d 480, 483 (Pa. 1971) (quoting Commonwealth v. Doris, 135 A. 313, 315 (Pa. 1926)). A defendant will not have a valid defense if there is not a sufficient break in the chain of events, and

23

a negligible passage of time does not make the robbery and homicide "distinct."  Johnson, 485
A.2d at 401.

Here, the jury found Petitioner guilty of second-degree murder for his involvement in the
robbery of Robert Janke which led to his murder.  Reid, 2016 WL 1292915, at *1 (quoting
Commonwealth v. Reed, 1725 Philadelphia 1993 (memorandum decision) (Pa. Super. filed
7/20/99), at 1-2).  Petitioner urges that he was not holding Janke down when Dwayne Bennett
killed him and that the murder occurred after the completion of the robbery while Petitioner was
farther up the street.  (Doc. No. 20 at 5; Doc. No. 2 at 20.)  But Petitioner has not provided sufficient
evidence to support these claims nor that he took appropriate steps to abandon the robbery prior to
the murder.   In fact, the support he provides is Dwayne Bennett's statement which shows that
Petitioner participated in the robbery.  (Doc. No. 2 at 24 ("All three men [D. Bennett, C. Bennett
and Petitioner] had guns.  [D. Bennett] put the gun to [Janke's] head while the other two were
going through his pockets.  We all knew about the robbery."))  Moreover, Petitioner admits that
the argument that Petitioner was "further up the street and just merely presen[t] when the [murder]
occurred" was made during cross-examination at trial and was unsuccessful.  (Doc. No. 2 at 20.)

Even if the Court were to consider Petitioner's argument as truthful, that he was down the
street at the time of the murder, he could still be charged with second-degree murder.  His proximity
to the location of the murder is insufficient to overturn his conviction given the other evidence
presented at trial.  See Johnson, 485 A.2d at 401 (holding that whether the defendant was standing
next to the perpetrator of the murder or three blocks from the residence is "of no consequence" to
a second-degree murder conviction); Commonwealth v. Pone, 251 A.3d 1265 (Pa. Super. Ct. 2021)
("To the extent that the only evidence of withdrawal from the conspiracy is that he left the [scene]
shortly before the murder, we conclude that the evidence is not sufficient to show abandonment").

No appreciable evidence has been presented to show that Petitioner abandoned the robbery prior to Janke's murder. Therefore, his second-degree murder conviction was warranted.

### 3. Respondents Did Not Adopt an Exonerating Statement

Second, Petitioner argues that during his PCRA proceedings, the ADA adopted admissions that show his innocence. But Petitioner takes these statements out of context. In ADA Laurie Williamson's closing statement to the PCRA court on November 7, 2012, she discussed Petitioner's attempted use of affidavits from Dwayne Bennett that tried to exonerate Petitioner. She argued to the court that Bennett lied in those affidavits. (Doc. No. 2 at 47-48.) Specifically, she stated the following:

> What [Bennett] said in 1993 in the affidavit was a lie. What he said before this Court was a lie. What he said to the police in his statement is the truth and then you have the 2008 affidavits of Dwayne Bennett and, again, Your Honor, more lies . . . .
>
> ***
>
> So, again, Your Honor, you have these affidavits that are just completely inconsistent with [Bennett's] testimony before this Court; inconsistent with one another; inconsistent with any semblance of rationality and I would submit to the Court, complete and utter lies.

(Id. at 48.)

> Then, ADA Williamson made the following statement:

> What was truthful, Your Honor, is what Dwayne Bennett told Miss Graham Rubin and Detective Rocks when he came to our office shortly before the hearing and was interviewed . . . .
>
> ***
>
> Miss Rubin was taking notes. [Bennett] said and what I recall is that Dwayne Bennett told me the following: All three of us robbed Robert Janke. All three of us had guns. Dwayne Bennett put the gun to his head while the other two were going through his pockets. We all knew about the robbery. What we all didn't know was that I was going to shoot and kill Robert Janke when it was over and that, Your Honor, is the truth. What happened in this case is a tragedy. It is a tragedy for everyone involved but that's what happened in this case and that, Your Honor, is second degree murder, plain and simple.

25

(Id.)

ADA Williamson did not make statements that Petitioner was not guilty of second-degree murder. Rather, she argued that it was likely Petitioner did not know Dwayne Bennett would kill Janke with the gun, but Petitioner was nevertheless involved in the robbery which led to Janke's death. And whether Petitioner knew Bennett would kill Janke is immaterial. The death occurred during the commission of the robbery which was the proper basis for his second-degree murder conviction.

Accordingly, Petitioner's claim based on Respondents' "adopted admissions" is without merit and will be denied.

## V.    CONCLUSION

For the foregoing reasons, the Court will overrule Petitioner's Objections to the Magistrate Judge's Report and Recommendation (Doc. No. 39), approve and adopt Magistrate Judge Sitarski's Report and Recommendation (Doc. No. 36), and deny the Petition for Writ of Habeas Corpus (Doc. Nos. 2, 20). The Court will not issue a certificate of appealability in this case. Petitioner has failed to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). An appropriate Order follows.